Good morning. You're Miss Provenzino. You may proceed. My name is Laura Provenzino and I am joined at council table by my colleague John Kokanen. Mr. Williams was not in custody. The district court's determination that he was is irreconcilable with this court's precedent. Now the ultimate inquiry in a decision of custody is whether there was arrest or whether there was restriction on his freedom of movement such that it was the functional equivalent of a formal arrest. And in this case, the interview took place in Mr. Williams' living room. It took place after he returned home and he saw a uniformed law enforcement officer outside in the driveway. He proceeded to the door, was encountered by a special agent who told them of the lawful purpose of the reason why they were at the house for the execution of a search warrant. He was asked if he would answer some questions. He was told it would be voluntary and he agreed to answer those questions. He was also told he was not under arrest and, in fact, he was not arrested at the end of the encounter. He was never escorted or supervised while in the house. His freedom of movement was not restrained. In fact, he was able to get up and get a glass of water from the kitchen. He was told that he could use the bathroom. He was told essentially he could go and do whatever he wanted. No threats or promises were made. No strong-arm tactics were used or any deceptive strategies were employed. In fact, over the course of the 30 to 45-minute interview, while the two agents and Mr. Williams were seated in his living room, there was a two-way conversation. In fact, over the course of that period of time, the agents did not even raise their voices. Nevertheless, the district court concluded that despite all of those circumstances arguing in favor of non-custody, that the existence of one factor outweighed all of them, and that was his conclusion of an overall atmosphere of police domination. The court focused on the force used to enter the home and the number of officers involved in the execution of the search warrant. Now, this court has found in Perrin that a warrant search is inherently police-dominated, but there's nothing untoward about that circumstance, and that's the case here. As a result of that finding of custody, the district court made several errors in getting there. The district court did so in concluding that the atmosphere was police-dominated at the time that Mr. Williams entered the house, when the proper inquiry as guided by this court in Axum is to look at the context of the interview itself. And as Axum did during the course of that interview, it was very similar to the context here. Mr. Axum, the agents were in his home for the execution of a search warrant. In fact, there were more agents in the home, a small home as noted on the record, in Axum than the facts are here. They were seated. A two-way conversation ensued. But in Axum, there were actually restrictions on his freedom of movement. He was escorted back to his bedroom. He was escorted to the bathroom. And when he wanted a glass of water, the agent said, wait a minute, I'll get it for you. Despite all of that, and a finding by the district court of a particular strong showing of police domination, this court found that it was non-custodial. In addition to that determination of looking at the atmosphere of the totality of the search, rather than the atmosphere at the time of the interview, the district court compounded that error by giving undue weight to that finding of police domination. As the Chicory Court held, an express advisement that the suspect is not under arrest and that his participation is voluntary, is the most obvious and effective means of demonstrating that he has not been taken into custody. And that was the case here. Mr. Williams was clearly told he was not under arrest. And in fact, he was not arrested. And he was told and asked if he would answer some questions and that his participation was voluntary. And in fact, the record indicates that he himself asked questions of the agents and that there was a two-way dialogue. Now, the district court did not give weight to those determinations which were found to be significantly weighty in a finding of non-custody in Chicory and Lebrun in other cases. The district court did give it weight, though, didn't it? It gave it weight to the fact that he was told he wasn't under arrest. The district court made a finding, correct, that that mitigating factor was met. So your position isn't that the district court ignored that, or is it? The district court gave undue weight to a finding of police domination at the exclusion of the absence of other aggravating factors and the presence of three mitigating factors. And elevating one factor above all others was not an appropriate balancing under the totality of the circumstances test. And it was a divide-and-conquer strategy by looking at any one factor and saying that could not overcome the weight of the police domination. And that was further error by the district court. But in looking at the district court's opinion and adopting the findings of the R&R and the conclusions of the R&R, on page 24, it is clear that the court was really focusing only on the police dominance by finding that the force used to enter the home and the number of officers led to the conclusion of custody. And viewing that portion of the R&R, it would be fair to say that the court excluded the presence of the mitigating factors and the absence of other aggravating factors in coming to that decision. And that would be an improper view of the totality of the circumstances. Page 24 of the magistrate's order, you're saying? Correct, Your Honor. The force used to enter the home and the number of armed officers present to execute the warrant lead the court to conclude that Williams was in custody. That sentence? Correct, Your Honor. And that finding is inconsistent both with the facts by looking toward the atmosphere of the overall search versus the timing of the interview. But it's inconsistent with this court's holdings in Axum where the district court had made a finding of particularly strong showing of police domination and this court found it to be non-custodial. Similarly, in Perrin, where force was used to enter the home while the subject was in the home and he was given advisements and he actually had more restriction on his freedom of movement and similarly, six tactical officers in the home and several police officers doing perimeter security this court, again, declined to find that police dominance outweighed any of the other factors for a finding of custody. And in Perrin, that was similarly non-custodial. You keep referring to a finding of custody. Do you mean to say that this is a factual question or isn't it a question of law? Thank you for that clarification and I apologize for my imprecision. No, this was a conclusion. This was a holding by the court that can be reviewed by this court de novo. It's a conclusion of law based on what the underlying facts are in the case. Yes, Your Honor. It was an application of the law to those facts. And in doing so, the district court really failed to look at that ultimate inquiry and where the focus should have been on whether the defendant's freedom of movement was restricted in any way. And finding instead and focusing on a preliminary question as to whether a reasonable person in that context would have been free to leave or terminate the interview. And there are many ways in which that could have occurred in this context. Based on those errors in the determination of custody, then the district court compounded that in finding that the statements given and the consent for the search of the vehicle were not voluntary. And the focus of that should have been on whether the police extorted that statement or the consent through some kind of coercive activity. That would have to include some type of activity or conduct by the police, including threats, violence, or expressed or implied promises. And there's absolutely no indication in the record of that. In fact, the district court made findings which defendant concedes that there were no threats, no promises, no strong-arm tactics, no deceptive strategies. In fact, they never even raised their voice. And as a result of that, that finding of involuntariness is inconsistent with Colorado v. Connolly and with this court's holdings in Watson and Carter. At this point, the government would like to reserve its remaining time for rebuttal. All right. You may do so. Ms. Menendez, we'll hear from you. Thank you, Your Honors. Good morning. Good morning. Your Honors, at the outset, I would like to disagree with the government's characterization made at the beginning of argument regarding what Mr. Williams found when he arrived at the home. The government's recitation didn't include the three to four police cars or his door and jam, both broken by the use of a battering ram. It didn't include that the police told him that evidence had been found in the execution of the search warrant, which he interrupted. Now, the government attempted to parse our brief by saying, well, it's not necessarily clear that he was told that incriminating evidence had been found, but I invite the court to use its common sense that law enforcement wouldn't advise the defendant that exculpatory evidence had been found and then proceed to interrogate him. Also omitted was the fact that there were eight or nine officers on the scene, some outside, some inside, some still uniformed, perhaps wearing raid jackets, all armed. These facts were part of what motivated the magistrate to determine that this was such an overwhelmingly police-dominated atmosphere that that factor, as well as others, should weigh in favor of a finding of custody. The government relies very heavily on this court's precedent from Axum, and I understand why it's certainly a relevant case for the court to consider. In Axum, uniquely, the defendant testified at the evidentiary hearing and said that he felt free to leave, that he used the phone while he was in the interrogation with the government, and while admittedly he was escorted throughout the scene, the record was very clear, if I'm not mixing this with another case, that that was because he had a sort of bizarre number of strange weapons around his home and there was a reason for the concern for officer safety. Similarly, in the LeBrun case, which the government relies very heavily on, it appears to me that that interrogation was videotaped and that the court was able to make a very careful assessment of the circumstances surrounding the defendant's feelings of being free to leave. I invite the court to look closely at all of the circumstances, because whether the court simply agrees with the lower court that the police-dominated atmosphere and its characterization of the other factors is enough to carry the day, or whether the court examines this record on its own under the de novo standard of review, the result is the same. This isn't a case where we have the district court having to make credibility determinations or decide between disputed areas of fact. So this court is in the same power that the magistrate and the district court were to decide that this person was in custody, and I believe that conclusion is required. I want to talk first about one of the Griffin factors, and while Judge Colleton, as you said, and Cicere, they don't control the day. There doesn't have to be a mechanical recitation of the six factors in order to reach a conclusion about custody, but they have been the dominant conversation on this question for more than 23 years, and they still guide this court's analysis. The question about what kind of advice was given to Mr. Williams is very critical here, and this is explored closely in the defense brief, so I won't restate it all the way. He was told that it was, quote, completely voluntary, although he was never given an explanation as to what that meant. Did that mean they were volunteering to question him, that he could terminate the questioning at any time? That second part was never advised. He was also told that he was not under arrest. Wait. Stop there for a second. Yes, Your Honor. Since you mentioned earlier that we could use our common sense, you're saying that when they told him that this was a voluntary exchange, he might have thought they only meant that the police were voluntarily participating? Your Honor, I recognize that he probably understands that what they were saying is you're here voluntarily, but when he's surrounded by eight or nine officers and never told that he's free to stop the questioning or leave, that's a two-word phrase that has a lot less meaning to a layperson than to us who understands the meaning of voluntary in the context of interrogation. Your Honor, as I cited in my brief, Well, wasn't he in his own home? He was certainly in his own home. So why would he want to leave? I'm sorry? Why would he want to leave? Well, if he wanted to get away from the eight to nine police officers dominating his home, the only way to do that was to leave his own home. How many officers participated in the questioning? I believe two, Your Honor. Isn't that a factor that's on the government's side? I mean, don't the cases, while they allude to the number of officers that may be in the vicinity, isn't it an important factor that we look at the number of officers that were actually participating in the questioning? Of course, Your Honor. That's certainly a relevant factor. But I would suggest that in a townhome, which is not a really large place, even though he's being questioned by two officers, he's surrounded by eight or nine officers who are freely walking from room to room, logging evidence. They've advised him that evidence has already been found, and they broke into his home with a battering ram. So while it's true that only two were actually engaging in the questioning, the presence of all of the officers certainly leads to a conclusion that he felt that he was not free to leave  Your Honors, I would also suggest that this court should look closely at the government's allegations regarding freedom of movement. In its argument, and certainly in its brief, the government has implied that freedom of movement was in no way restrained in this case, and we certainly don't have handcuffs or being locked in a room or anything like that. But contrary to what the government just suggested, he was never told that he could do whatever he wanted, and I would suggest that common sense again dictates that he couldn't have freely gone to his bedroom, removed things from the scene, made phone calls, told people they were executing a search warrant and that he'd like to stop it. There are limits to what he could have done. And in fact, what he was told is that he could do two things, get a glass of water and use the restroom. If anything, the suggestion that he could get a glass of water and use the restroom leads to a strong inference that he wasn't allowed to do other things. Admittedly, there is no testimony one way or the other about his efforts to do other things and being stopped, but the question is how a reasonable person in his shoes would feel during that moment. Your Honors, another one of the factors that I find to be very interesting in this case is the question of whether the person voluntarily acquiesced to the questioning initiated the questioning himself or did not voluntarily acquiesce to the questioning. I think that the case law of this Court is a little bit unclear on the fact that that's actually sort of a spectrum factor that can go all the way from weighing in favor of a finding of custody, not being voluntarily there but being there because your probation officer required you to be, to going down to the police station or inviting the police to come to your home because you have information you want to give. That's initiating the conversation. The middle ground here is arguably voluntarily acquiescing to questioning. It is true that he answered questions out of his own mouth, so he certainly acquiesced to questioning. But, Your Honors, in Griffin itself, it talks about how this factor can go several ways, ranging from agreeing to be questioned or acquiescing to questioning when it's initiated by the government all the way to not being there voluntarily at all. In this case, that's why I said in my brief, that cuts both ways. He certainly didn't initiate this conversation. He didn't call the police to come to his home and question him. He didn't even say, look, I'd really like to talk to you about this. I want to explain myself. On the other hand, he wasn't forced to be there by his probation officer, and he didn't refuse to answer any questions until they battered concessions out of him. So I would argue that this actually does cut both ways, that this is somewhere in the middle between those two possibilities articulated. I think that it's clear, Your Honor, that there were no false statements, there were no strong-arm tactics in this case, and that those two certainly do weigh in favor of a finding of non-custody. But I would suggest that every other factor set forth in the Griffin test, and frankly in the totality of the circumstances assessment, supports the finding that he was in custody. I would suggest, Your Honors, that I'd like to talk about just a couple of the cases that we cite in our brief that I think support the magistrate's finding. First of all, I think the Griffin case itself is very important to this Court's analysis. Granted, it's not a recent case, it's from 1990, but it's a case that has been cited over and over again and provides a great deal of guidance. In the Griffin case, the police initiated the contact, and they specifically noted the difference between that and when a defendant voluntarily goes downtown and arranges an interview. And in the Griffin case, as here, the police assumed control of the interrogation and the site, and the police were dictating the conduct, even though they were in the suspect's own home. And the quote from Griffin that I think should guide this Court's analysis is that where conduct of police leads a suspect to believe that the police have taken full control of a scene, that supports a finding of custody. And in this case, everything about the situation that Mr. Williams came home to that night led him to believe that the police were in charge in full control of the scene, and I think that has to inform his feeling that he was in custody once he arrived. Your Honors, I'd also like to discuss a little bit the Cichre case, because it is certainly a similar case to this one, and I understand that it's going to be closely examined by this Court. Also because, Your Honor, Judge Colleton authored it. In Cichre, it was an IRS investigation at the person's house. They came to his home early in the morning and questioned him. They advised him at least eight times, according to this Court's opinion, that the questioning was voluntary, that he was free to ask them to leave. And this Court described very clearly that that was powerful evidence that he could not feel that he was in custody because he had been so repeatedly and thoroughly advised that he wasn't. That is in contrast to this case, where the advice is at most two phrases, there is no evidence that was repeated over and over, and that doesn't support a suggestion that he should have believed based on what they told him that he was free to leave. I'd also note that although Cichre, even with those stronger facts of custody, was found to be not in custody, it was a 2-1 decision with a strong dissent. And I think that when you look at all of the cases that this Court has issued addressing this matter, that the magistrate and the district court's order in this case is supported by that case law and supported by the facts. Well, do you think the magistrate's order was supported by the case law, or do you think it was based on disagreement with the case law? Since the magistrate says, for example, past decisions have stretched and manipulated Miranda in many instances. What do you think he was referring to there? You're correct, Your Honor, that in this report and recommendation, there is a suggestion that the repeated unwillingness to find custody in so many situations the magistrate was suggesting undermines the applicability of Miranda. And frankly, Your Honors, I'd like to remind the Court of what the Griffin Court said, and I quote, the constant reluctance of law enforcement to advise suspects of their rights is counterproductive to the fair administration of justice in a free society. I understand it's beside the point, but these are federal agents, highly trained, planning to go to Mr. Williams' home with a search warrant. It's not like they were taken unawares, like there was an exigency. I can't for the life of me understand why they just didn't advise him of his rights and end this entire conversation. And perhaps it's that frustration that the magistrate was hinting at, but Your Honors, he doesn't have to repudiate this court's prior case law to reach, and he did reach, the proper result based on the facts in this case. And Your Honors don't have to repudiate this court's prior case law. In fact, within this court's prior case law is support for the finding that Mr. Williams was in custody. I have pointed the court to cases in my brief, including the Cowan case and the Griffin case, both of which are findings of custody despite somebody being at home. The magistrate pointed the court to a handful of decisions from other circuits. I chose not to rely on those as much because I think that this decision finds support in this court's case law, and I recognize Your Honors find authority from the Ninth or Fourth Circuit to be at most enlightening rather than controlling, but I do not think that Your Honors have to do what the magistrate suggested, which is step away from this court's precedent in order to affirm his ruling. Your Honors, I also disagree that I am inviting the court to make factual findings that were not before the court, a theme that sort of ran through the government's brief. I think that Your Honors have the exact same ability that the magistrate and the district court judge did in this case to look at this transcript, and in the facts of this transcript, we know several things. We know that this environment was completely dominated by law enforcement. We know that, at best, the advice of his ability to terminate the interview and leave was limited, was less than the, quote, strong medicine that this court endorsed in Ali and that was discussed in Sanchez. It was, at best, an imperfect admonition that he didn't have to stay and talk, that he could quit the conversation at any time, that he was free to leave. So I invite the court to read closely what was said. Similarly, the conversation about being invited to get a drink of water or use the bathroom, the officer actually couldn't even remember whether Mr. Williams did get a drink of water. He said, I think so. So this is not a case where he was, in fact, moving about his home freely or anything else. Your Honors, unless there are any questions, I would invite the court to examine the brief and the records and the case law. Thank you very much. Thank you, Your Honor. Ms. Provenzino, we'll hear from you in rebuttal. Thank you. To clarify the record, the motions hearing transcript on page 25, when the special agent was asked by defense counsel the question, and you suggested he get a glass of water, the special agent responded, I said that he was free to get water or whatever else he needed. So it was a much more expansive options to move about the home and do what he needed that's not found in other cases before this court that were found to be noncustodial. Williams' counsel brings up Axum, and Axum did testify in that case. But any testimony by him is not relevant to the findings here of custody because it's an objective test. You don't look to the subjective findings of the defendant himself. Certainly, as Your Honor asked Judge Colleton, being told it's voluntary, a reasonable person would understand that that means whether to engage in questions and respond to questions, in which he did. This court held in Sanchez that voluntary is really the same side of the coin as being free to decline questioning. And in terms of the advisements in this case, it's clear on the record that there was at least one advisement that he was not under arrest and at least one advisement that it was voluntary. And this court has found those similar advisements present in Axum, in Huther, to be more than sufficient to meet the first factor of Griffin. And under Chicory, that is evidence, being told that it's voluntary, one of the most controlling, obvious, and effective means of a determination that it's not custody. Griffin did provide guidance, and law enforcement did precisely what they should and acted professionally in this situation. He did voluntary acquiesce. He came home. He passed by cars, vehicles of law enforcement. He passed by a uniformed officer, and he met with an agent. At each step of the way, then, he acquiesced in further engagement with law enforcement, sat down in his living room, and agreed to answer questions. And again, the key issue is whether or not he was in custody, which should be looked at as akin to formal arrest, and there's absolutely no evidence of that in the record. Defendant concedes, of course, that he wasn't handcuffed, but further, he was free to move about, and he in fact did move about, and he engaged in questioning. There's no finding of any restraint on freedom of movement, which is different from other cases in this circuit, such as Perrin, where he was removed to his bedroom to answer questions, and that, in and of itself, during the execution of a search warrant, still was not found to be custodial. Now, this was during the context of a search warrant, and this really was a garden variety search warrant in a child pornography case. And if the district court's order is allowed to stand, that would effectively mean that any time during the execution of a search warrant, and law enforcement wants to engage in an interview with the suspect, that he would be in custody and have to be Mirandized. And that is absolutely inconsistent with this court's rulings, and the Supreme Court had an opportunity to address that issue in Oregon v. Mathiason over 30 years ago and declined to make that finding. And I submit this is not the appropriate case for it here, and it would be inconsistent with all of the court's other guidance on this particular issue. The circumstances surrounding Mr. Williams' interview compel a finding that the interview was non-custodial and Miranda warnings were not required. The government respectfully asks that you reverse the district court's order suppressing Mr. Williams' statements and his consent to search the vehicle where a laptop computer was recovered. Very well. Thank you for your argument. I thank both counsel. The case is submitted.